Skeete v New York City Health & Hosps. Corp. (2026 NY Slip Op 50127(U))

[*1]

Skeete v New York City Health & Hosps. Corp.

2026 NY Slip Op 50127(U)

Decided on February 6, 2026

Supreme Court, Kings County

Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 6, 2026
Supreme Court, Kings County

Cheryl Skeete, Plaintiff,

againstNew York City Health and Hospitals Corporation, Defendants.

Index No. 522154/2023

Plaintiff
Michael A. Fruhling (mfruhling@lawyertime.com)
Gersowitz, Libo & Korek, P.C.
111 Broadway 12th Floor
New York, NY 10006
212-385-4410
Defendant
Jay Tucker Weatherston (jweatherston@vlhlaw.com)
Vaslas, Lepowsky & Hauss, LLP
201 Edward Curry Avenue Suite 100
Staten Island, NY 10314
718-761-9300

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: 31 — 46, 48 — 51, 52
Defendant New York City Health and Hospitals Corporation ("NYCHHC") moves for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all Plaintiff's claims against them (Seq. No. 3). Plaintiff opposes the motion.
Plaintiff commenced this action on August 1, 2023, asserting claims of medical malpractice in connection with the diagnosis and treatment of kidney stones and sepsis at Kings County Hospital, a NYCHHC facility.
On October 18, 2022, Plaintiff presented to Kings County Hospital emergency department by ambulance at 6:04 p.m. She had been found on the floor of her apartment and [*2]exhibited altered mental status, fever, tachycardia, and hypotension. While in the emergency room, she was administered broad spectrum antibiotics, intubated, and admitted to the ICU with septic shock.
CT scans of her abdomen and pelvis were ordered at 9:45 p.m. and performed at 2:11 a.m. The CT results returned at approximately 4:40 a.m., showing a 4.4 mm renal calculus obstructing her left distal ureter.
A urology consult was ordered by attending physician Raghavan Shradha, M.D. at 8:56 a.m. Plaintiff was examined by a urology resident at 1:22 p.m., who noted the obstructing renal calculus and recommended placement of a nephrostomy tube by interventional radiology. Plaintiff was evaluated by the interventional radiology consult at 4:35 p.m., and she underwent the nephrostomy tube placement at 5:17 p.m on October 19, 2022.
Plaintiff remained in unstable condition following the procedure and continued to receive vasopressor support to maintain her blood pressure. She was later weaned off vasopressors, extubated, and transferred from the ICU to medical floor on October 22. She was subsequently treated for ischemia of the left hand and bilateral toes. Plaintiff's left hand was ultimately amputated in March 2023, and she underwent additional left arm surgeries and amputation of all five toes on her right foot.
Plaintiff alleges that the NYCHHC physicians and staff failed to timely diagnose and treat the source of her infection and sepsis. Plaintiff alleges that these delays proximately caused and contributed to her sepsis complications, prolonged need for vasopressors, and ultimately her limb ischemia and amputations.
In evaluating a summary judgment motion in a medical malpractice action, the court considers the "essential elements" of medical malpractice: "(1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury" (Miller-Albert v EmblemHealth, 231 AD3d 1147, 1148 [2d Dept 2024] [internal quotation marks and citations omitted].) "Thus, a defendant moving for summary judgment must make a prima facie showing either that there was no departure from accepted medical practice, or that any departure was not a proximate cause of the patient's injuries. To meet that burden, a defendant must submit in admissible form factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice." (I.d.) "If the defendant makes such a showing, the burden shifts to the plaintiff to raise a triable issue of fact as to those elements on which the defendant met its prima facie burden of proof" (Delia v Wieder, 236 AD3d 857, 858 [2d Dept 2025]). "Generally, summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions" (Garcia v Hollander, 241 AD3d 651, 653 [2d Dept 2025] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023]).
In support of their motion, NYCHHC submits an expert affirmation from Steve H. Salzman, M.D. ("Dr. Salzman"), a licensed physician board certified in critical care medicine.
Dr. Salzman opines that the movant acted in accordance with the standard of care at all times in treating Plaintiff. He states that she arrived at Kings County Hospital emergency department with severe sepsis, which was "immediately recognized" based on her vital signs. He opines she was properly intubated and placed and mechanical ventilation, and a proper sepsis protocol was activated, including complete blood labs and cultures, broad spectrum antibiotics, [*3]and IV fluid resuscitation. He opines that this complied with the standard of care.
The movant's expert states that after these labs and cultures were ordered, Plaintiff had a "timely" diagnostic CT scan, which revealed an obstructing kidney stone. Dr. Salzman opines that Plaintiff obtained proper urology and interventional radiology consults, and a nephrostomy was performed "immediately thereafter" to drain the source of her infection.
Dr. Salzman opines that Plaintiff's critical condition required prolonged use of multiple vasopressors (levophed/norepinephrine, vasopressin, and epinephrine). He opines that "these medications were necessary and appropriately administered to the patient in accordance with the standard of care," due to her severe hypotension and risk of death. He further opines that Plaintiff continued to exhibit low blood pressure and fever after the nephrostomy. He opines that "the risk of prematurely removing the vasopressor support is cardiac arrest and death," and therefore the standard of care requires the patient to be gradually weaned from vasopressors. Following the nephrostomy procedure, he opines that Plaintiff's vasopressor infusion was gradually reduced over 48 hours while her blood pressure was monitored, in accordance with the standard of care.
Based on evaluation of these submissions, the Court finds the movant has not established prima facie entitlement to summary judgment. "In order to sustain this prima facie burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's complaint and bill of particulars" (Ciceron v Gulmatico, 220 AD3d 732 [2d Dept 2023]). Plaintiff's essential claim against the hospital is a failure to timely identify and treat the source of her infection. The bill of particulars sets forth allegations which include the failure to order a "stat" CT scan, timely perform a CT scan, timely obtain appropriate consults, and timely perform a nephrostomy. However, the movant's expert never addresses the issue of whether the CT scan should have been ordered on a "stat" or emergent basis. The expert fails to discuss, with any detail or citations to the medical record, whether the order, performance, and results of the CT scan were timely obtained in accordance with the standard of care. The expert also fails to address claims that the alleged delay affected the timeliness of the removal of the source by placing a nephrostomy tube.
The expert only briefly addresses the CT scan by stating that "once this very ill patient was stabilized, [she] was taken for imaging to identify the source of infection; a CT scan of the abdomen and pelvis was resulted at 4:40 a.m." He then opines in a later paragraph that "timely diagnostic studies" were performed. The expert does not include any other facts addressing the timing of the CT scan. As noted by Plaintiff, the patient arrived shortly after 6:00 p.m., a CT scan was ordered at approximately 9:45 p.m., it was performed at 2:11 a.m. (while the patient remained intubated and hypotensive), and the results ultimately returned at 4:40 a.m. The expert evades any discussion of the span of time between the patient's emergency department presentation and the CT scan order, or whether the actual performance and transmission of the CT scan results should have been completed on an urgent basis. The expert's opinion that diagnostic studies were "timely" is conclusory, not supported by the record, and does not rebut those claims in the bill of particulars.
The expert states that "Plaintiff was next seen by urology," but offers no opinion on the timeliness of ordering and obtaining the urology and interventional radiology consults. The expert opines that Plaintiff was "properly referred to interventional radiology," and a nephrostomy tube was placed "immediately thereafter, at or around 4:36 p.m." Again, the expert fails to address the allegation that the hospital did not order and obtain these consults on a timely [*4]basis once her CT scan revealed an obstruction, although this claim was set forth in Plaintiff's bill of particulars.
Although the expert states the patient underwent a nephrostomy placement "immediately" after the interventional radiologist consult, the expert does not address Plaintiff's allegation that there was a delay of several hours before the patient was seen by the interventional radiologist, a necessary prerequisite of the procedure. Thus, the movant's expert fails to address and rebut Plaintiff's claim that they failed to complete the steps to performing a timely nephrostomy procedure and remove the source of her infection. His opinion that all treatment was in accordance with the standard of care is conclusory, speculative, and unsupported by the record.
On the issue of proximate causation, the expert opines that no acts or omissions of NYCHHC were the proximate cause of her injuries. He emphasizes that her highly elevated creatinine levels indicated that her kidneys were failing and "she had likely been septic for several days" at the time she was admitted. He also notes that her highly elevated white blood cell count and low bicarbonate levels were consistent with an acute, severe bacterial infection and renal failure, and her lactic acid level indicated "a high risk of mortality from septic shock" and multi-organ failure. Therefore, he opines that she arrived already in a critically ill state, and NYCHHC's alleged departures did not proximately cause her sepsis complications and prolonged use of vasopressors.
The expert acknowledges that tissue ischemia is a potential result of vasopressor use due to the constriction of arteries, but he opines that the use of vasopressors in Plaintiff's case was necessary, not excessive, and based on her own ability or inability to maintain a stable blood pressure as the medication was titrated and weaned. Further, he opines that her "severe underling infection" and hypercoagulable state on arrival were factors which directly led to ischemia, necrosis, and gangrene, rather than any alleged act or omission of the physicians and staff.
Based on evaluation of these submissions, the Court finds the movant has not met their prima facie burden on the issue of proximate causation. As discussed above, the expert does not address Plaintiff's specific allegation that the delay in obtaining a CT scan and performing a nephrostomy proximately caused Plaintiff's injuries. Although the movant's expert opines that Plaintiff arrived in a critically ill state, he fails to support his opinion that no alleged acts or omissions by the hospital — specifically, the alleged delay in treating the source of her infection — led to her worsened condition and prolonged vasopressor use. The expert acknowledges that her injuries were caused by her "underlying infection" and reliance on vasopressors, on which she remained for 48 hours following the nephrostomy. However, he does not opine as to the timing of her treatment and whether an earlier nephrostomy procedure could have resulted in an earlier weaning period and reduced her risk of ischemia and subsequent amputations.
In sum, the Court finds that the movant's expert has failed to rebut the specific allegations set forth in Plaintiff's bill of particulars, and therefore they have not met their prima facie burden regardless of the sufficiency of Plaintiff's opposition.
Notwithstanding, Plaintiff submits an expert affirmation in opposition from a licensed physician [name of expert redacted], board certified in urology. The expert's signed and unredacted affirmation was presented to this Court for in camera inspection.
Plaintiff's expert opines that the defendant hospital departed from the standard of care in timely diagnosing and treating the source of Plaintiff's infection. Specifically, they opine there was a negligent delay in performing the CT scan and obtaining its results, and a further delay to [*5]control the source of the infection through decompression/nephrostomy procedure.
Plaintiff's expert notes that from the time she arrived in the emergency department, it was approximately 24 hours before she underwent the nephrostomy tube placement. The expert opines that the first significant delay was the nearly 10-hour period before her CT results were transmitted. The expert opines Plaintiff presented to the emergency department with septic shock, "grossly positive urinalysis," and a known history of nephrolithiasis, suggesting a likely urinary source of infection. The expert opines that in these circumstances, the standard of care required "rapid identification of a urologic source" of the infection, followed by "prompt decompression."
Plaintiff's expert opines that her abdominal/pelvic CT scan should have been ordered on a "stat" and urgent basis, and then "conducted and read within an hour or two upon a STAT order." The CT scan was ordered at 9:45 p.m. (over three hours after her arrival), performed at 2:11 a.m., and the results were transmitted at 4:40 a.m. The expert opines this nearly 10-hour period before obtaining the CT scan results constituted an "unacceptable" departure from the standard of care.
The expert further opines that once the CT scan results showed a 4 mm ureteral stone, "the standard of care required immediate urological and/or IR [interventional radiology] consult and the patient should have been immediately brought to the operating room." The expert opines that once the stone was identified, the ICU should have called urology for an urgent/immediate consult, and the urologist would recommend decompression with a stent or nephrostomy tube (as was ultimately performed in this case). Plaintiff notes the urology consult did not take place until 1:22 p.m., and "there was no effort to expedite the IR consult" by the urologist or attending physician. Plaintiff was ultimately seen by interventional radiology at 4:39 p.m., which was required before the nephrostomy procedure could be performed. The removal of the source of infection took place approximately an hour later. The expert opines that these gaps in diagnosis and treatment leading up to the nephrostomy placement, nearly 24 after her admission, were a departure from the standard of care.
Regarding proximate causation, Plaintiff's expert counters the opinion of the movant's expert and opines that the delay in treating the source of infection led to prolonged sepsis and continued vasopressor use. The expert states that Dr. Salzman "wholly overlooks the fact that [Plaintiff] required the continued need of vasopressors because her obstruction was not timely addressed." The expert opines that until the source of infection is removed, vasopressors cannot improve overall perfusion, and the body cannot begin to heal. Thus, the expert opines that Plaintiff's critically ill state — and the necessity and efficacy of vasopressors — was prolonged and worsened by the combined delays in her CT scan, urology and interventional radiology consults, and draining the source of her infection.
Plaintiff's expert has offered detailed opinions that the alleged deviations from the standard of care contributed to a delay in removing the source of her infection, which worsened Plaintiff's overall clinical picture, affected the necessity and effectiveness of vasopressors, and ultimately resulted in long-term complications including limb ischemia, gangrene, and amputations.
The Court finds that even if the movant had met their prima facie burden, Plaintiff's expert has raised issues of fact sufficient to defeat the motion for summary judgment. Plaintiff's expert opined that the standard of care required urgent testing and treatment of Plaintiff's underlying source of infection, including an "stat" order and performance of the CT scan and [*6]prompt urology and interventional radiology consults once the CT scan results returned. Plaintiff's expert also raises issues of fact that the approximately 20-hour period before the source of her infection was treated was a proximate cause of her prolonged use of vasopressors and subsequent injuries.
Contrary to the movant's argument in reply, the Court finds that Plaintiff's expert has laid a proper foundation to opine on the issues of this case. A medical expert need not be a specialist in a particular field, but must demonstrate they are "possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the opinion rendered is reliable" (Behar v Coren, 21 AD3d 1045, 1047 [2d Dept 2005]; see also Pezulich v Grecco, 206 AD3d 827 [2d Dept 2022]). Plaintiff's expert affirms that in addition to their board certification in urology, they have relevant education and background as a urologist in a hospital setting, and thus they are familiar with the standard of care in treating urinary sepsis in such a setting. The argument that Plaintiff's urology expert is not qualified to opine on the relevant treatment and care at issue is misplaced.
In their attorney affirmation in reply, the movant argues that the patient's CT scan could not be performed within the 1-2 hour timeframe suggested by Plaintiff's expert, because she needed to be "assessed, treated, and stabilized prior to being taken for imaging." However, as discussed above, the movant's critical care expert never addressed the timing of the CT scan in detail, nor did he render an opinion that stat/urgent treatment was not possible because the patient was unstable. Thus, this argument is only proffered by counsel and not supported by the expert affirmation in their initial moving papers.
Notwithstanding the movant's failure to meet their prima facie burden, the Court finds that Plaintiff's expert has submitted conflicting opinions as to the standard of care and proximate causation, and on this additional basis summary judgment cannot be granted as a matter of law.
Accordingly, it is hereby:
ORDERED that Defendant NYCHHC's motion (Seq. No. 3) seeking summary judgment is DENIED.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez,
J.S.C,